**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BENEDICT ZICCARELLI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 CV 9602 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| RICHARD G. PHILLIPS, JR., an individual, | ) | |
| and PILOT AIR FREIGHT CORPORATION, | ) | |
| a Pennsylvania corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>**MEMORANDUM ORDER AND OPINION**</u>

This matter is before the Court on Defendant's motion to dismiss [14]. For the reasons stated below, the Court grants the motion in part and denies the motion in part. The Court gives Plaintiff 28 days from the date of this order to replead the counts that the Court has dismissed and otherwise supplement the allegations of his complaint if he believes that he can do so within the requirements of Federal Rule of Civil Procedure 11.

**I.     Background**

For the purposes of reviewing the instant motion, the Court accepts as true the facts alleged in Plaintiff's complaint and makes all reasonable inferences in his favor. See, *e.g.*, *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 879 (7th Cir. 2012).

**A.     Facts**

Plaintiff Benedict Ziccarelli is a citizen of Illinois. [1] ¶ 1. He formerly was employed by Defendant Pilot Air Freight Corporation ("Pilot"), a privately owned transportation and logistics company that is incorporated and has its principal place of business in Pennsylvania. *Id.* ¶¶ 3, 6, 7. Pilot has offices throughout the United States, including Illinois. See *id.* ¶ 7.

Defendant Richard Phillips, Jr. is a citizen of Pennsylvania. See *id.* ¶ 2.

Plaintiff began working at Pilot's Elk Grove Village, Illinois, office as a sales manager in July 2000. *Id.* ¶ 8. Plaintiff's salary at that time was $75,000 per year. *Id.* At some point, Plaintiff was promoted to the position of Midwest Regional Sales Director. *Id.* ¶ 9. In this position, Plaintiff received a salary of $95,000 per year and became eligible for performance bonuses. *Id.* The bonuses were payable according to a formula that Pilot's management orally conveyed to Plaintiff. *Id.* All of the performance reviews Plaintiff received while in this position were favorable. *Id.* ¶ 10.

In October 2005[1], a number of high-ranking members of Pilot's management took Plaintiff to dinner at the Pennsylvania Hotel to "award and celebrate the turnover of the Chicago office to a Franchise Office to be owned by Mr. Ziccarelli and Randy Gentile." *Id.* ¶ 11. Pursuant to an e-mail agreement, Plaintiff was to receive the franchise in late 2005 or early 2006. See [24] at 3. From that point forward, Plaintiff expected that he would be awarded a franchise. [1] ¶ 11. Plaintiff also expected, based on representations made by "Pilot management," that he would receive a promotion to vice president and a concomitant salary increase to $160,000 per year. *Id.* ¶ 12. Plaintiff's immediate supervisor, Gordon Branov, repeatedly reiterated the latter representation and at some point Pilot printed business cards that designated Plaintiff as a vice president. See *id.* ¶ 13. In light of these assurances, Plaintiff decided not to pursue employment opportunities with other companies that expressed interest in hiring him. *Id.* ¶ 17.

Plaintiff attended Pilot's national sales meeting in May 2006. See *id.* ¶ 20. While there, Plaintiff got into an alteration with Lou Cortese, who was at that time Pilot's president. See *id.*

---

[1] In his brief opposing Defendants' motion to dismiss, Plaintiff states that the "celebratory dinner was held in New York City in January of 2006." [24] at 3. The Court uses the date alleged in the complaint, though it will consider additional facts alleged in the briefing to the extent that they are consistent with the allegations of the complaint. See *Geinosky v. City of Chi.*, 675 F.3d 743, 746 n.1 (7th Cir. 2012); *Help at Home, Inc. v. Med. Capital, L.L.C.*, 260 F.3d 748, 752-53 (7th Cir. 2001).

Plaintiff and Cortese had a "difference of opinion regarding the substandard performance of a Pilot vendor," and Cortese "physically and verbally confronted" Plaintiff about it during a national sales meeting. *Id.* Cortese was the aggressor during this incident and subsequently apologized to Plaintiff. *Id.* Plaintiff was never disciplined or reprimanded in connection with this incident. *Id.*

In 2008, Plaintiff was promoted from Midwest Regional Sales Director and became District Manager of Pilot's Chicago office. See *id.* ¶ 18. Plaintiff indicates in his briefing that he understood this promotion to be the initial step toward his eventual elevation to vice president. See [24] at 4. Plaintiff initially earned $101,745 per year in this position, but after only one month as District Manager he received a raise that increased his salary to $103,780 per year. See [1] ¶ 18. During Plaintiff's four-year tenure as District Manager, the Chicago office became profitable, broke records, and exceeded company profit expectations. *Id.* ¶ 19. Plaintiff held the position of District Manager until his termination from Pilot in July 2012. See *id.* ¶ 18. Plaintiff alleges in his brief that he performed "all of the job responsibilities of a vice president while his job title remained district manager." [24] at 5.

At some point during Plaintiff's tenure at Pilot, Branov made representations to Plaintiff concerning Plaintiff's bonus compensation. See [1] ¶ 15. Branov told Plaintiff that he would be guaranteed minimum quarterly bonuses irrespective of the actual bonus goals that he attained. *Id.* Branov also told Plaintiff that the bonuses related to Pilot's account with Amazon.com would be calculated pursuant to a formula different from the one used for all other accounts. See *id.* Pilot paid Plaintiff bonuses in accordance with Branov's representations during the third and fourth quarters of 2010 but stopped doing so after that despite Plaintiff's repeated requests to Branov and Branov's assurances that Plaintiff's bonus compensation would be computed

pursuant to the new scheme.  See *id.* ¶ 16.

In February 2012, Plaintiff had a heated telephone conversation with a subordinate employee, Steve Bullard.  See *id.*  Bullard worked in a facility managed by Plaintiff, and he had called to complain about an electrical outage for which he believed Plaintiff was responsible. See *id.*  After the conversation, Bullard reported to Pilot's human resources that Plaintiff had threatened to kill him.  *Id.*  Pilot's human resources manager took no action after investigating Bullard's claims, and Pilot's counsel characterized Bullard's claims as "complete bullshit." *Id.*

On May 25, 2012, Plaintiff confronted Pilot employee Kathy Cieplevicz at work about her ownership and operation of Simplicity Freight Solutions, a company that directly competed with Pilot in contravention of Pilot's policies.  *Id.* ¶ 22.  Later that night, Cieplevicz, with whom Plaintiff "had a consensual relationship" that was known but not objected to by Pilot management, unexpectedly visited Plaintiff's house.  *Id.* ¶ 23; [24] at 6.  Cieplevicz was intoxicated and was angry about her earlier confrontation with Plaintiff.  See [1] ¶ 23. Cieplevicz physically attacked Plaintiff's girlfriend.  *Id.*  The police were called and Cieplevicz was arrested on charges of assault and battery.  See *id.*  On the next workday, May 29, 2012, Plaintiff informed Branov both about Cieplevicz's competing business and her attack on his girlfriend.  *Id.* ¶ 24.  Plaintiff also "clearly expressed his discomfort" relating to the prospect of a continued working relationship with Cieplevicz, *id.*, and expressed concern that "this was not an isolated incident and that Kathy Cieplevicz was capable of repeating such behavior."  *Id.*  ¶ 94. Plaintiff and Branov determined at this time that Cieplevicz should be terminated for cause.  *Id.*

Cieplevicz was not terminated immediately, however.  *See id.* ¶¶ 25-26.  Instead, she remained at Pilot and did "all she could to fight her termination."  *Id.* ¶ 27.  Cieplevicz "was aware of many improprieties occurring at Pilot including discriminating and harassing behavior

by Pilot management and employees" and "us[ed] that information to leverage what should have been her for cause termination to a more favorable separation." *Id.* Cieplevicz also falsely alleged that Plaintiff had sexually harassed her. *Id.* Pilot's human resources manager interviewed Plaintiff about Cieplevicz's allegations. *Id.* ¶ 28. Plaintiff denied the charges and cooperated with the investigation at all times. *Id.* He also discussed other incidents of sexual harassment involving other Pilot employees and managers with Pilot's counsel during the investigation. See *id.*

Cieplevicz ultimately was terminated on June 29, 2012. See *id.* ¶ 26. Her termination was not for cause, and she received a severance package that her family described as "a ridiculous amount of money." *Id.* Plaintiff alleges that Cieplevicz was able to obtain such favorable separation terms by threatening to sue Pilot. See *id.* ¶ 32. Plaintiff further alleges that one of Cieplevicz's demands was that Pilot fire him. *Id.* ¶ 33.

Branov terminated Plaintiff's employment with Pilot three weeks after Cieplevicz was terminated, on July 19, 2012, "at or about the same time that Kathy Cieplevicz signed her severance agreement with Pilot." *Id.* ¶¶ 29, 37. Branov informed Plaintiff that the termination was for cause and was "based in part on two prior incidents": the May 2006 incident with Cortese and the February 2012 incident involving Bullard. *Id.* Plaintiff did not receive a severance package. See *id.* ¶ 37. After Plaintiff's termination, "Pilot has attempted to add additional reasons for [it], specifically that he showed 'poor judgment' regarding Kathy Cieplevicz, and was uncooperative during Pilot[']s investigation of Kathy Cieplevicz." *Id.* ¶ 29. Plaintiff alleges that the termination was not due to any of these incidents but was in fact a result of Pilot's attempts to "appeas[e] Kathy Cieplevicz's termination demands," *id.* ¶ 32, to extricate itself from various expensive agreements with Plaintiff, including promises to award Plaintiff a

franchise, to promote Plaintiff to a vice presidency, and to pay Plaintiff bonuses according to the special formula articulated by Branov in 2010, see *id.* ¶¶ 34-36, and to retaliate against him for reporting Cieplevicz's unlawful conduct, expressing his concerns about his personal safety in the workplace, and for discussing other instances of sexual harassment during Pilot's investigation of Cieplevicz's allegations. See *id.* ¶ 42.

Since Plaintiff's termination, rumors have spread at Pilot and to others in the industry that he was fired because he sexually harassed Cieplevicz. *Id.* ¶¶ 38, 52. Plaintiff alleges that various Pilot employees, including Bullard, Rachel Chapman, Kristen Limini, Manny Silva, David Gilland, Andrew Karpov, Bud Moran, and David Norkette, have perpetuated the false allegations.[2] *Id.* ¶ 39. Pilot has not taken any action to stop the circulation of the rumors despite being put on notice of them as early as August 2012. *Id.* ¶ 40. To the contrary, Plaintiff alleges in his brief that Branov conveyed the rumors to third parties, see [24] at 8 n.4, and that an individual with whom Plaintiff later unsuccessfully interviewed told Plaintiff that a Pilot employee had told him (the interviewer) that Plaintiff had been fired for engaging in harassment. See *id.* at 7-8

**B.   Plaintiff's Claims**

Plaintiff asserts seven claims against Pilot and one claim against Defendant Phillips. In Count I, he alleges that Pilot improperly terminated him for retaliatory reasons in contravention of public policy. See [1] ¶¶ 41-47. In Count II, Plaintiff alleges that Pilot defamed him by publishing throughout its workforce Cieplevicz's false allegations of sexual harassment. See *id.* ¶¶ 48-54. In Count III, which sounds against both Pilot and Phillips, Plaintiff alleges that Pilot and Phillips violated the Illinois Wage Payment and Collection Act ("IWPCA") by failing to pay

---

[2] In his brief, Plaintiff represents that some of these individuals were in fact "third parties outside of Pilot." [24] at 7. Because these allegations are inconsistent with those in the complaint, the Court relies on the allegations in the complaint.

him monies owed him under his various agreements with Pilot. See *id.* ¶¶ 55-67. In Count IV, Plaintiff alleges that Pilot "breached its agreement to compensate [him] pursuant to Pilot's management and specifically Gordon Branov's representations that Pilot would pay [Plaintiff] for increased salary and bonus monies, including minimum bonus payments." *Id.* ¶ 70. He further alleges that Pilot breached its agreement to award him a Pilot franchise. In Count V, Plaintiff alleges in the alternative a claim for promissory estoppel. See *id.* ¶¶ 73-79. He alleges that Pilot reneged on its oral promises to promote him to vice president and pay him bonuses according to the revised scheme, and that he reasonably relied on these promise to his detriment by forgoing job opportunities with other employers. See *id.* ¶¶ 74-77. In Count VI, Plaintiff alleges that Pilot negligently failed to abide by its employee guidelines when it failed to terminate Cieplevicz for operating a competing business. See *id.* ¶¶ 80-91. And in Count VII, Plaintiff alleges that Pilot "breached its obligation to [Plaintiff] to ensure his personal safety within his workplace and showed a reckless disregard for his right to a safe and productive work environment." *Id.* ¶ 96.

Defendants have moved to dismiss all seven claims pursuant to Federal Rule of Procedure 12(b)(6). See [14].

## II.    Legal Standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. See *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," such that the defendant is given "'fair notice of what the * * * claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). For a claim to be plausible, the plaintiff must put forth enough "facts to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's allegations. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Although "[s]pecific facts are not necessary [–] the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests," *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original) – "at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Brooks*, 578 F.3d at 581 (quoting *Airborne Beepers & Video, Inc. v. AT & T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007)). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*, 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

III.  **Discussion**

    A.  **Retaliatory Discharge (Count I)**

In Count I, Plaintiff alleges a state law claim for retaliatory discharge.[3] This tort "is an exception to the general rule that an 'at-will' employment is terminable at any time for any or no cause." *Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009) (quoting *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 878 (Ill. 1981)). It is a "limited and narrow cause of action," *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009), that "seeks to achieve a proper balance * * * among the employer's interest in operating a business efficiently and profitably, the employee's interest in earning a livelihood, and society's interest in seeing its public policies carried out." *Id.* at 375 (quoting *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 876 (Ill. 1991)). Generally, it is most properly invoked where "an employer could effectively frustrate a significant public policy by using its power of dismissal in a coercive manner." *Fellhauer*, 568 N.E.2d at 876. To that end, Illinois courts have allowed retaliatory discharge actions in two settings: (1) where the employee is discharged for filing or preparing to file a claim under the Workers' Compensation Act, and (2) "when an employee is discharged in retaliation for the reporting of illegal or improper conduct, otherwise known as 'whistle blowing.'" *Jacobson v. Knepper & Moga, P.C.*, 706 N.E.2d 491, 493 (Ill. 1998); see also *Brooks v. Pactiv Corp.*, --- F.3d ---, 2013 WL 4774519, at *8 (7th Cir. Sept. 6, 2013) ("Illinois courts have emphasized that the retaliatory-discharge cause of action is a narrow and limited exception to the employment-at-will doctrine."). Illinois courts consistently have refused to expand the tort to reach personal and individual grievances. *Irizarry v. Ill. Cent. R.R. Co.*, 879 N.E.2d 1007, 1012 (Ill. App. Ct. 1st Dist. 2007). To state a claim of retaliatory discharge under Illinois common law, a plaintiff must allege that he was "(1) discharged; (2) in retaliation for [his] activities; and (3) that the discharge violates a clear

---

[3] Although the complaint refers both to Title VII of the Civil Rights Act and the Illinois Human Rights Act, see [1] ¶ 44, Plaintiff's brief in opposition to the motion to dismiss indicates that he is not seeking to proceed under those statutes but rather invoked them only for the purpose of demonstrating that the public policy he contends that Pilot violated is "clearly mandated."

mandate of public policy." *Teruggi v. CIT Group/Capital Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013) (quoting *Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009)).

Here, Defendants do not dispute that Plaintiff was discharged. They take issue, however, with Plaintiff's allegations as to the second and third elements of the claim.

First, they contend that Plaintiff's factual allegations concerning the alleged retaliation are contradictory and render it "impossible to tell what Plaintiff is contending." [15] at 3. Defendants point specifically to Plaintiff's simultaneous allegations that his termination "had everything to do with appeasing Kathy Cieplevicz's termination demands," had "nothing to do with the Kathy Cieplevicz incident," and that his termination "was not premised on the earlier incident * * * with Kathy Cieplevicz." [15] at 3. The Court respectfully disagrees with Defendants' assessment. Plaintiff's complaint, which at this stage the Court must construe in the light most favorable to him, alleges that Plaintiff was terminated, [1] ¶ 29, that Pilot cited not the Cieplevicz incident but rather the long-past Cortese and Bullard incidents as its grounds for the termination, *id.*, that Pilot later "attempted to add additional reasons for [Plaintiff's] termination, specifically that he showed 'poor judgment' regarding Kathy Cieplevicz, and was uncooperative during Pilot[']s investigation of Kathy Cieplevicz," *id.*, and that he was actually terminated either to appease Cieplevicz's demands, see *id.* ¶¶ 32-33, to eliminate Pilot's obligation to pay significant monetary sums to him, see *id.* ¶ 36, or in retaliation for various complaints he made. See *id.* ¶ 42. These factual allegations are sufficiently clear to put Defendants on notice of Plaintiff's alternative theories, which Plaintiff is permitted to plead simultaneously "even if the pleadings are inconsistent." *Alper v. Altheimer & Gray*, 257 F.3d 680, 687 (7th Cir. 2001).

Defendants next contend that, to the extent that Plaintiff invokes the public policies embodied in Title VII and the Illinois Human Rights act, his retaliatory discharge claim is

preempted by those statutes. See [15] at 3-4. Plaintiff concedes that his claim is preempted (and not exhausted, see [24] at 9) to the extent that he alleges that his termination was in retaliation for reporting Cieplevicz's out-of-work behavior to management or for discussing other instances of sexual harassment during Pilot's investigation of Cieplevicz's allegations against him. See [24] at 12 ("Thus, Mr. Ziccarelli's retaliation claim based on his informing Pilot of other instances of harassment and inappropriate behavior is preempted * * * *"). In light of this concession and Plaintiff's apparent abandonment of those particular theories, the Court grants in part Defendant's motion to dismiss the Count I claims that rest upon them.

Defendants' final arguments in favor of dismissing Count I concern Plaintiff's allegations that he was terminated for expressing concern about workplace safety. Defendants contend both that "'workplace safety' is simply too vague a 'policy' to support a public policy claim" and that "Plaintiff fails to plead any predicate factual allegations that he made any complaint or report regarding 'workplace safety.'" [15] at 5. The latter argument is not persuasive. Plaintiff alleges that that he was terminated after reporting Cieplevicz's "assaultive conduct" and "express[ing] his discomfort * * * with the prospect of a continued working relationship at Pilot." [1] ¶ 24. He also alleges, later on in his complaint, that "he was concerned this was not an isolated incident and that Kathy Cieplevicz was capable of repeating such behavior," *id.* ¶ 94, that he was concerned about "similar behavior in the future," *id.* ¶ 95, and that he was concerned about "her demonstrated tendency toward violence." *Id.* ¶ 96. Read in the light most favorable to him, these allegations reasonably suggest that Plaintiff lodged a complaint with Branov about workplace safety rather than a mere "personal and individual grievance."

Whether Defendants are correct that "workplace safety" is too vague a public policy to support a cause of action for retaliatory discharge presents a closer question. The Illinois

11

Supreme Court has held that "the general concept of 'patient safety,' by itself, is simply inadequate to justify finding an exception to the general rule of at-will employment." *Turner*, 911 N.E.2d at 378, and has characterized as equally vague the "'right to marry' a coworker; 'product safety'; 'promoting quality health care'; and 'the Hippocratic Oath.'" *Id.* at 376 (citations omitted). It has not, however, passed on the question of whether "workplace safety" is a sufficiently specific policy, and neither side has pointed the Court to any instructive case law from the Illinois Appellate Court. Defendants vaguely assert only that "there is case law to support a retaliatory discharge claim based on reporting criminal activities, [but] the cases are inapposite." [15] at 5; see also [26] at 3-4. Plaintiff points to a case from this district in which the court concluded that "Illinois has a clearly mandated public policy towards protecting its citizens from all forms of violence, including violence that occurs in the workplace." *Daoust v. Abbott Labs.*, 2007 WL 118414, at *4 (N.D. Ill. Jan. 11, 2007). The Court finds the reasoning of the *Daoust* court persuasive, particularly where, as here, the plaintiff alleged that he was discharged "in response to his complaints of being subjected to physically threatening behavior by a subordinate employee." *Id.* at *1. The Court also finds analogous *Vance v. Dispatch Management Service*, 122 F. Supp. 2d 910, 912 (N.D. Ill. 2000), in which the court concluded that firing an employee for seeking an order of protection against another employee "would be firing her for reporting a co-worker's criminal or improper conduct," which "would violate Illinois public policy as determined by the Illinois Supreme Court." Defendants are correct that there are some factual differences between the *Vance* and the instant case, namely that the alleged aggressor here never physically harmed Plaintiff, but the Court is not persuaded that these factual differences warrant a different conclusion about the overall policy of workplace safety. The Court is reluctant to hold at this stage that Illinois has no public policy interest in

workplace safety. See *Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 505 (7th Cir. 1998) ("This Court is not willing to hold that Illinois has no public policy interest in the safety of the aircraft that fly into and out of Illinois airports. Nor, in the context of a motion to dismiss, will we hold that the Illinois courts would not afford Fredrick the protection offered by the cause of action for retaliatory discharge."). Accordingly, Defendants' motion to dismiss Count I is denied in part as to Plaintiff's claim that he was improperly terminated in retaliation for raising concerns about workplace safety.[4]

### B.    Defamation (Count II)

Plaintiff alleges in Count II that Cieplevicz made false statements about him (her allegations of sexual harassment), that Pilot knew these statements to be false or recklessly disregarded whether they were true, and that Pilot "published these defamatory statements throughout the Pilot workforce." [1] ¶ 49. Plaintiff further alleges that defamatory rumors that he was fired for sexually harassing Cieplevicz were spread to others in the industry beyond Pilot's walls and that Pilot "is responsible" for the actions of its gossiping employees. See *id.* ¶ 50. In his brief, Plaintiff clarifies that "the defamatory statement at issue is that Mr. Ziccarelli was terminated for engaging in sexual harassment, or words to that effect." [24] at 15.

"To prove a defamation claim, the evidence must show that a defendant made a false statement concerning the plaintiff, that there was an unprivileged publication of the defamatory

---

[4] Defendants also contend that Plaintiff's claim should be dismissed because "once Ms. Cieplevicz complained about Plaintiff's sexual harassment, public policy and the law, as reflected in Title VII and the IHRA, mandated that Pilot investigate her allegations," and "[t]o recognize a claim for retaliatory discharge in these circumstances would impact Pilot's legal duty to investigate accusations of workplace sexual harassment and is thus outweighed by contravening public policy, the policy reflected in Title VII and the IHRA." [15] at 6. Defendants do not point to any case law suggesting that it is appropriate for the Court to weigh the relative importance of various public policies to determine whether a claim has been stated. Moreover, this argument rings hollow to the extent that Defendants argue (and Plaintiff concedes) that any claims invoking Title VII or the IHRA are preempted, and that Plaintiff is not in this count alleging that his discharge was improperly motivated by Cieplevicz's allegations of harassment.

statement to a third party by the defendant, and that the plaintiff suffered damages as a result." *Giant Screen Sports v. Canadian Imperial Bank of Commerce*, 553 F.3d 527, 532 (7th Cir. 2009). "Some statements are considered defamatory *per se* because they are 'so obviously and materially harmful' to a plaintiff that his injury may be presumed and he does not need to prove actual damages to recover, as the defamatory character is apparent on its face." *Id.* (quoting *Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006). Plaintiff asserts that the statement at issue here is defamatory *per se* because it imputes an inability to perform or want of integrity in performing employment duties and prejudices him in his profession or business. See *Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006) (setting forth the five categories of statements recognized as defamatory *per se* under Illinois law). Even if the statement is not defamatory *per se*, Plaintiff contends, it is still actionable because he was damaged by it. Plaintiff seeks to hold Pilot responsible for the alleged defamation and his alleged damages under a theory of *respondeat superior*. See *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1140 (7th Cir. 1985).

Defendants contend that Pilot cannot be held liable for any defamation because Plaintiff has failed to plead that any of the named Pilot employees who allegedly spread the defamatory rumor did so while acting in furtherance of Pilot's business. Defamation, like other intentional torts, lies within the scope of *respondeat superior* only when "the employee or agent is acting in furtherance (however misguidedly) of his principal's business." *Powell v. XO Servs., Inc.*, 781 F. Supp. 2d 706, 714 (N.D. Ill. 2011) (quoting *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 913 (7th Cir. 1994)). Thus, if the Pilot employees publishing the allegedly defamatory statements about Plaintiff did so to engage in a "purely private vendetta[, Pilot] would not be liable under any reasonable conception of respondeat superior." *Rice*, 38 F.3d at 913. The statements need not have been published solely to advance the employer's interest, but furthering the principal's

14

business must have been at least one aim.  *Powell*, 781 F. Supp. 2d at 714.

Plaintiff's complaint does not contain any allegations as to the motivation of the Pilot employees that spread the defamatory statement or the context in which they did so.  His brief, however, avers that "[i]t is unclear why [Pilot employees would publish the defamatory statement] since *there was no legitimate business purpose for making such statements* to others, both within and outside Pilot."  [24] at 17 (emphasis added).  This allegation negates the possibility that any of the employees named in his complaint and brief disseminated the rumors to advance Pilot's interests.  In *Powell* the court allowed the plaintiff's *respondeat superior* theory to move forward in spite of the plaintiff's similarly explicit allegations that one of the alleged defamers "was acting on the basis of a personal vendetta."  *Powell*, 781 F. Supp. 2d at 714.  The plaintiff also alleged, however, that the alleged defamers "were acting as agents of [defendant employer] and within the scope of their employment."  *Id.*  The court thus reasoned that "Powell's complaint can be read as alleging that [the alleged defamer with the personal vendetta] acted to further both his own interest and the Company's."  *Id.*  Here, Plaintiff does not allege that the Pilot employees who published the statement "were acting as agents of [Pilot] and within the scope of their employment," nor does he otherwise temper his allegation that the employees had no legitimate business purpose for making the statement.  Consequently, he has failed to allege a basis upon which Pilot may be held liable for any defamatory statements published by its employees.  The Court accordingly grants Defendants' motion to dismiss Plaintiff's defamation claim against Pilot.

## C.    Breach of Contract  (Count IV)[5]

In Count IV, Plaintiff alleges that he and Defendant Pilot had oral contracts pursuant to

---

[5] The Court follows the lead of the parties and addressees Plaintiff's breach of contract claim before addressing his IWPCA claim.

which he would be awarded a franchise, receive a promotion, and have his bonuses calculated pursuant to a nonstandard formula. See [1] ¶ 70. Plaintiff alleges that Defendant Pilot breached these oral contracts. Defendant contends that all of Plaintiff's contract claims "are fatally deficient because: (1) Plaintiff does not allege a clear and definite promise/offer; (2) Plaintiff does not allege adequate consideration; and (3) even assuming, for the sake of argument only, that contract claims have been stated, those contracts were modified by the parties' subsequent actions." [15] at 14.

Under Illinois law, "oral employment contracts are viewed more skeptically than written ones." *Zemke v. City of Chi.*, 100 F.3d 511, 513 (7th Cir. 1996). The Seventh Circuit has interpreted this skepticism to extend to oral contracts beyond those guaranteeing permanent employment. See *id.* (requiring "definite and certain" terms in contract for electrician job with no indication that the job was permanent or not at-will). Oral employment contracts nevertheless may exist where there is an offer, an acceptance, and a meeting of the minds as to the terms of the agreement. *In re Marriage of Haller*, 980 N.E.2d 261, 269 (Ill. App. Ct. 5th Dist. 2012); see also *Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 109 (Ill. 2006) ("In Illinois, an offer, acceptance, and consideration are the basic ingredients of a contract."). "For the contract to be enforceable, the material terms must be definite and certain, meaning that the court is enabled from the terms and provisions, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do." *In re Marriage of Haller*, 980 N.E.2d at 269; see also *Zemke v. City of Chi.*, 100 F.3d 511, 513 (7th Cir. 1996). "[A]n offer is clear and definite as long as 'an employee would reasonably believe that an offer has been made.'" *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 363 (7th Cir. 2005) (quoting *Duldulao v. St. Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 318 (Ill. 1987)); see also *Wigod v. Wells Fargo Bank,*

16

*N.A.*, 673 F.3d 547, 561 (7th Cir. 2012) ("In Illinois, the test for an offer is whether it induces reasonable belief in the recipient that he can, by accepting, bind the sender." (quotation omitted)). "The test is an objective one." *Kiddy-Brown*, 408 F.3d at 363. Mere "optimistic expressions about the future and statements which are informal in character and express only long continuing good will and hope for eternal association are insufficient to establish an oral contract * * * *'" *Kercher v. Forms Corp. of Am., Inc.*, 630 N.E.2d 978, 981 (Ill. App. Ct. 1st Dist. 1994) (quotation omitted). Likewise, "when 'some further act of the purported offeror is necessary, the purported offeree has no power to create contractual relations, and there is yet no operative offer.'" *Wigod*, 673 F.3d at 561 (quoting 1 Joseph M. Perillo, CORBIN ON CONTRACTS § 1.11, at 31 (rev. ed. 1993)); see *id.* at 561-62 (collecting cases). Contracts with open terms may be enforced if "the terms to be agreed upon in the future can be determined independent of a partyer's mere wish, will, and desire * * *, either by virtue of the agreement itself or by commercial practice or other usage or custom." *Id.* at 564-64 (quotation omitted).

Defendants first contend that "Plaintiff cannot establish valid and enforceable contracts because he did not receive clear promises for a franchise, a promotion, or a bonus." [15] at 14. As to the franchise, Defendants contend that the alleged promise was "vague at best." *Id.* They contend that "the creation of a franchise typically is a complex business transaction memorialized in a detailed franchise agreement," and without such an agreement "Plaintiff could not reasonably have believed that Pilot committed to withdrawing from the Chicago market and turning over its operations in that city to Plaintiff as a franchisee." *Id.* at 14-15. As to the promotion, they contend that Plaintiff's failure to allege that the parties agreed as to a timeframe for the promotion renders any alleged contract unenforceable. See *id.* at 15. And as to the bonuses, Defendants contend that any offer was not definitive because Plaintiff "does not even

allege a formula for the Amazon.com bonus," "[k]ey terms * * * are completely undefined, and Plaintiff does not specify when the bonuses were to be paid." *Id.* at 16.

In his brief, Plaintiff fleshes out the complaint's allegations as to the terms of the parties' alleged agreements. He clarifies that the alleged franchise agreement was made in November 2005 between himself and Phillips, was contingent upon continued improvement at the Chicago office, and was memorialized by e-mail in addition to the celebratory dinner. See [24] at 3. As to the promotion, Plaintiff alleges that it was promised to him by Branov and included his elevation to District Manager in 2008 as well as the production of business cards designating Plaintiff as a vice president. Plaintiff also alleges that he and Branov understood that Plaintiff would assume the vice president position "within three months" of the promotion to District Manager, and that as District Manager he "was performing all of the job responsibilities of a vice president." *Id.* at 4-5. And as to the bonuses, Plaintiff reiterates his allegations that he was offered and accepted the new scheme and was in fact paid under the new compensation rubric for two quarters. He also clarifies that he was to be paid the bonuses every quarter. See *id.* at 5-6, 22 n.10. All of these allegations are consistent with those set forth in the complaint and accordingly will be considered.

In light of Plaintiff's supplemental allegations, the Court concludes that Plaintiff has alleged "clear and definite" offer terms as to all three potential contracts. Plaintiff has alleged facts – albeit mainly in his brief – from which a reasonable person might conclude, notwithstanding the absence of written documentation, that his employer would be promoting him, paying him additional bonuses, or awarding him a franchise according to reasonably specific timetables. He does not at this stage need to allege a specific definition for "gross revenue," or refute Defendants' contentions that a franchise agreement should have contained

licensing and other complex terms. These issues may be further explored at the summary judgment stage.

Defendants next contend that Plaintiff failed to plead consideration because he "does not allege that he refused another job offer or that he relocated in reliance on the franchise, promotion or bonus allegedly promised." [15] at 17. Consideration is any act or promise which is of benefit to one party or detriment to the other. *Steinberg v. Chi. Med. Sch.*, 371 N.E.2d 634, 639 (Ill. 1977). It generally consists of some detriment to the offeror, some benefit to the offeree, or some bargained-for exchange between them. *Wigod*, 673 F.3d at 563-64. In the context of contracts for permanent employment, most Illinois courts have held that the employee must allege and prove that he or she forwent specific alternative job opportunities or incurred some other detriment, such as relocating, in exchange for the promise of continued employment. See *Kirgan v. FCA, LLC*, 838 F. Supp. 2d 793, 799-800 & n.3 (C.D. Ill. 2012). Although this case arises in a slightly different context, the parties agree that to demonstrate consideration for an employment contract of the sort alleged here, Plaintiff similarly "must refuse a job offer, relocate, or suffer a similar detriment." [24] at 23 (citing [15] at 17).

Plaintiff alleges in his brief that he "was offered, and ultimately rejected, $160,000 per year to be the vice president of competitor AFC Worldwide Express in early 2010," and that "[t]he sole reason that Mr. Ziccarelli remained under the employ of Pilot was that Mr. Branov promised to promote Mr. Ziccarelli and match that salary." [24] at 23. He also contends that he rejected this job opportunity in February 2010 "so that he would enjoy the benefits promised to him by Pilot" as to both "the new franchise and a vice presidency." *Id.* at 5. These allegations, taken as true, demonstrate that Plaintiff refused a specific job offer in consideration for Pilot's

promises as to the franchise and promotion.[6]  Plaintiff further alleges that the award of the franchise was contingent on the performance of Pilot's Chicago office, which he "dramatically improved."  [24] at 3.  Plaintiff's performance of this alleged condition could also constitute consideration.  Additionally, like the plaintiff in *Kirgan*, Plaintiff alleges that he performed bargained-for work beyond that required by his job description, namely that he carried out the duties of a vice president while nominally a District Manager with the expectation that he would soon be elevated to the position of vice president.  See *Kirgan*, 838 F. Supp. 2d at 799, 801.  This, too, can constitute consideration, at least at this stage of the case.  See *id.*

Plaintiff does not aver that his refusal of the job offer from AFC Worldwide Express (or his willingness to perform vice-presidential-level work) had anything to do with Branov's alleged promise to change the terms under which Plaintiff's bonuses would be paid.  However, given the timing of Plaintiff's refusal of the offer, February 2010, [24] at 5, and Pilot's payment of bonuses according to the new scheme, "the third and fourth quarters of 2010," [1] ¶ 16, one reasonably could infer that the promise was made – and performed – to induce Plaintiff to stay at Pilot or to reward him for doing so despite Pilot's delay in fulfilling its other promises to Plaintiff.  See *DiLorenzo v. Valve & Primer Corp.*, 807 N.E.2d 673, 678 (Ill. App. Ct. 1st Dist. 2004) ("A bonus promised to induce an employee to continue his employment is supported by adequate consideration if the employee is not already bound by contract to continue.").  The Court thus concludes, at this stage, that Plaintiff adequately has alleged consideration as to all three putative contracts.

Defendants' final argument in favor of dismissing Plaintiff's contract claims is that "if any agreement were made, its terms were modified and accepted by Plaintiff."  [24] at 17.  "A

---

[6] The parties do not address whether there is any significance to the lapse of time between the alleged offers and consideration on Plaintiff's part.  They may do so at the summary judgment stage.

contract is validly modified if the party which did not propose the changes is shown to acquiesce to the modification through a course of conduct consistent with acceptance." *Int'l Bus. Lists, Inc. v. Am. Tel. & Tel. Co.*, 147 F.3d 636, 641 (7th Cir. 1998). Defendant contends that even if there were oral contracts governing the franchise, promotion, and bonuses, they were modified when Plaintiff accepted Pilot's offer to become District Manager instead of a vice president or franchisee, and when he accepted payment of bonuses under the original compensation scheme rather than the new one. In support, they cite *Kamboj v. Eli Lilly & Co.*, 2007 WL 178434, at *8 (N.D. Ill. Jan. 18, 2007), which states that Illinois case law "reflects that continuance under the modified conditions is both acceptance of the new terms and consideration in return for new wages paid." The very next paragraph of *Kamboj* follows up that general statement, however, with the caveat that because the plaintiff "was unaware of the fact that [the employer] was not going to fulfill [its] alleged promises," "it cannot be said that she 'accepted' the modified terms during this period." *Kamboj*, 2007 WL 178434, at *9; see also *Anthony Marano Co. v. Passoff*, 2012 WL 6861752, at *8 (Ill. App. Ct. 1st Dist. Dec. 20, 2012) ("To prove notice, an employer asserting a modification must prove that he unequivocally notified the employee of definite changes in employment terms." (quotation omitted)). The same is true in this case; according to Plaintiff's allegations, which the Court must credit at this stage, he was unaware until his termination that Pilot had no intention of ever fulfilling its alleged promises to him. To the contrary, he alleges that he made inquiries as to at least the promotion and bonus and was repeatedly assured that he would eventually receive both. Additionally, Plaintiff contends that he accepted the District Manager position with the understanding that it was a condition precedent to his elevation to vice president. [24] at 23. Taken as true, this allegation plausibly

suggests that Plaintiff's acceptance of the District Manager position was not an acquiescence to modify the contract governing his promotion but rather was in furtherance of performing it.

Defendants' motion to dismiss Count IV is denied.

### D.    IWPCA (Count III)

In Count III, Plaintiff alleges that both Defendants, Pilot and Phillips, violated the IWPCA by failing to pay him the salary and bonuses they promised him. Defendants first contend that Plaintiff's claim against Phillips should be dismissed because he is not an "employer" within the meaning of the IWPCA.

The IWPCA requires employers to "pay every employee all wages earned during the semi-monthly pay period," 820 ILCS 115/3, and to "pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILCS 115/5. The IWPCA defines an "employer" to "include any individual, partnership, association, corporation, limited liability company, business trust, employment and labor placement agencies where wage payments are made directly or indirectly by the agency or business for work undertaken by employees under hire to a third party pursuant to a contract between the business or agency with the third party, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee, for which one or more persons is gainfully employed." 820 ILCS 115/2. It also provides that "in addition to an individual who is deemed to be an employer under Section 2 * * *, any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of [the IWPCA] shall be deemed to be the employers of the employees of the corporation." 820 ILCS 115/13. The Illinois Supreme Court has interpreted these two provisions in tandem, explaining that

> [W]hen considered together, [they] form a coherent and entirely sensible policy. Section 2 confirms that an employer is liable both for its own violations of the Wage Act and for any Wage Act violations committed by its agents. Section 13, in turn, imposes personal liability on any officers or agents who knowingly permit the Wage Act violation. Unlike a literal reading of section 2, which imposes strict Wage Act liability upon all supervisory employees, this reading reserves personal Wage Act liability for those individual decision makers who knowingly permitted the Wage Act violation.

*Andrews v. Kowa Printing Corp.*, 838 N.E.2d 894, 899-900 (Ill. 2005).

Under this expansive interpretation, Phillips could be an "employer" if he worked for Pilot in a decision-making capacity and knowingly permitted the alleged violations of the IWPCA. Defendants contend that Plaintiff's complaint fails to allege any facts about Phillips from which one could conclude that he was a Pilot decision maker who knowingly allowed the corporation to violate the IWPCA. See [15] at 21. Defendants are correct that the complaint's allegations concerning Phillips are threadbare at best. In the complaint, Plaintiff alleges that Philips is "an individual," [1] at 1, who is "a citizen of the State of Pennsylvania and resides in Philadelphia, Pennsylvania." *Id.* ¶ 2. He further alleges that Phillips is "an employer as defined in 820 ILCS 115/2," *id.* ¶ 57, and that he "breached the IWPCA by failing to pay [Plaintiff] salary monies owed to [Plaintiff] per his agreement with Pilot, through Gordon Branov, and bonus monies owed to [Plaintiff] by Pilot as represented to him by Gordon Branov." *Id.* ¶ 62. These allegations are insufficient, even if proven true, to implicate Phillips as an employer; they do not even aver that Phillips worked at Pilot. Plaintiff in his brief adds the additional allegations that Phillips was Pilot's president, [24] at 25, that "[a]ll of Gordon Branov's actions required Richard Phillips, Jr.'s advice or consent and thus he was acting directly or indirectly in the interest of Pilot in relation to" Plaintiff, *id.*, and that "Branov did not have authority to provide this promotion [to vice president] without Richard Phillips, Jr.'s approval." *Id.* at 4. These additional allegations, which are not inconsistent with the allegations contained in

23

Plaintiff's complaint, suggest that Phillips knowingly permitted the alleged IWPCA violations to occur. That is enough at this stage for Plaintiff's IWPCA claim against Phillips to survive.

Defendants also argue that the IWPCA claims against them should be dismissed for two additional reasons. First, they contend that Plaintiff cannot state an IWPCA claim as to the bonuses or promotion because no "employment contract or agreement," as required by 820 ILCS 115/2, existed as to either of these items. [15] at 21. They make the same arguments against the existence of contracts that they did against Plaintiff's breach of contract claim. See [15] at 21. The Court rejects these arguments at this time for the same reasons enumerated above. Furthermore, even if there were no contracts, Plaintiff's IWPCA claim still could go forward because Illinois courts have interpreted an "agreement" under the IWPCA to be "broader than a contract and require[ ] only a manifestation of mutual assent on the part of two or more persons; parties may enter into an 'agreement' without the formalities and accompanying legal protections of a contract." *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012) (quoting *Zabinsky v. Gelber Grp., Inc.*, 807 N.E.2d 666, 671 (Ill. App. Ct. 1st Dist. 2004)); see also *id.* ("The parties do not dispute that Hess had a valid contract with the firm (his 'employment agreement,' not to be confused with 'agreement' as it is used by the IWPCA).") To plead the existence of an "agreement," "a worker seeking to recover under [the IWPCA] does not need to plead all contract elements if she can plead facts showing mutual assent to terms that support the recovery." *Landers-Scelfo v. Corporate Office Sys., Inc.*, 827 N.E.2d 1051, 1059 (Ill. App. Ct. 2d Dist. 2005). "[E]mployers and employees can manifest their assent to conditions of employment by conduct alone." *Id.*; see also 17 Ill. Law & Prac.: Employment § 10 (2006) ("[A]n employment agreement need not be a formally negotiated contract. Generally, an employment agreement is formed when one party promises to render service in exchange for the other party's

promise to pay wages.").

Here, Plaintiff alleges that Pilot, through Branov, told him that he would be paid under a specific bonus scheme and that he was then in fact paid pursuant to that scheme for two quarters before his bonus payments reverted to the previous scheme. As to the promotion, Plaintiff alleges that Pilot, through "management," told him that he would be promoted to vice president, appointed him to what was represented to be the stepping-stone position of District Manager, and printed business cards designating him a vice president. He further alleges that while he was serving as District Manager, he in fact was performing the work of a vice president. Plaintiff's allegations about the parties' conduct support the inference that he and Pilot (and Phillips, who allegedly knew of and endorsed Pilot's actions) had agreements as to both the bonuses and the promotion, regardless whether any formal contracts existed between the parties.

Second, Defendants contend that any contracts or agreements by the parties were "modified" by Plaintiff's acquiescence to different terms, namely his acceptance of the position of District Manager and payment under the standard bonus scheme. As above, the Court agrees with the reasoning of the *Kamboj* court as far as contracts are concerned. To the extent that this line of case law is equally applicable to "agreements" as it is to "contracts," the additional cases cited by Defendants similarly provide mixed support at best to their position. These cases suggest that a modification does not necessarily occur where the defendant "continued to operate under the former plan * * * and continued to negotiate with plaintiff," *Geary v. Telular Corp.*, 793 N.E.2d 128, 132 (Ill. App. Ct. 1st Dist. 2003), or where the plaintiff "inquired further" into the matter rather than simply complaining, *Bommelman v. Transfer Print Foils, Inc.*, 2000 WL 816792, at *9 (N.D. Ill. June 22, 2000).

For purposes of his IWPCA claim, Plaintiff adequately has alleged that Phillips was an "employer" within the meaning of the IWPCA and that he and Defendants had contracts or agreements pursuant to which he would be paid special bonuses and promoted. He also has alleged – in his brief – that he "earned" the vice presidential salary by performing vice presidential duties while nominally serving as District Manager. See [24] at 5. Accordingly, the motion to dismiss Count III is denied.

### E.      Promissory Estoppel (Count V)

Promissory estoppel is a common law doctrine that permits enforcement of a promise made without consideration if the promisor reasonably should have expected the promise to rely on the promise and the promise did so rely to his detriment. *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 523 (Ill. 2009) (quoting BLACK'S LAW DICTIONARY 591 (8th ed. 2004)). To state a claim for promissory estoppel, Plaintiff must allege "that (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Id.* at 523-24; see also *Wigod*, 673 F.3d at 566 (same).

Plaintiff alleges that Defendant Pilot unambiguously promised him a promotion and payment according to an alternative bonus scheme, that he justifiably relied on those promises to his detriment by foregoing other job opportunities, and that Pilot reasonably should have expected him to do so. See [1] ¶¶ 74-78. Defendants contend that the alleged promises were ambiguous because they were not clear and definite and that Plaintiff has failed to plead detrimental reliance because his complaint does not allege that he forwent a specific job opportunity in reliance on Pilot's promises. As explained above, the allegations in Plaintiff's brief regarding his rejection of the AFC job offer serve to remedy the facial infirmity of his

pleading, and he has at this stage adequately alleged clear and definite offers. Defendants also contend that Plaintiff cannot bring a claim for promissory estoppel "when he claims that a contract existed for the very terms that he alleges were enshrined in a contract." [15] at 20. Yet plaintiffs are permitted to plead alternate theories of recovery, and the Seventh Circuit specifically has permitted plaintiffs proceeding under Illinois law to assert both contract and promissory estoppel claims at the motion to dismiss stage. See *Wigod*, 673 F.3d at 560-64. Plaintiff adequately has pleaded his claim of promissory estoppel; Defendants will be able to put him to his proof at the summary judgment stage. For now, however, Defendants' motion to dismiss Count V is denied.

### F.     Negligence—Failure to Follow Articulated Procedures (Count VI)

In Count VI, Plaintiff alleges that Pilot had an implied duty to follow the policies contained in its employee handbook and that it breached that duty by failing to take any action against Cieplevicz after learning of her competing business. Due to Pilot's failure to terminate Cieplevicz immediately, Plaintiff further alleges, Cieplevicz was afforded the opportunity to make defamatory statements about Plaintiff, which in turn proximately caused Plaintiff to be terminated and suffer other damages. See [1] ¶¶ 80-91. Defendants contend that Plaintiff has not adequately pleaded a negligence claim, and that he also has failed to plead a breach of contract claim, to the extent this claim is properly characterized in that fashion.

To state a claim for negligence, Plaintiff must plead that Defendants owed a duty to him, that they breached that duty, and that the breach was a proximate cause of his injury. *Jones v. Chi. HMO Ltd. of Ill.*, 730 N.E.2d 1119, 1129 (7th Cir. 2000). Plaintiff points to Pilot's employee handbook as the source of Pilot's duty to him. See [1] ¶ 87 ("Pilot owed a duty to all Pilot employees, including Mr. Ziccarelli, to follow the guidelines it established and published in

the employee handbook.").  In Illinois, "[w]hether a legal duty exists is a question of law and is

determined by reference to whether the parties stood in such a relationship to each other that *the*

*law* imposes an obligation on one to act for the protection of the other."  *Rhodes v. Ill. Cent. Gulf*

*R.R.*, 665 N.E.2d 1260, 1272 (Ill. 1996); see also *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d

1092, 1097 (Ill. 2012).  "Where the law does not impose a duty, one will not generally be created

by a defendant's rules or internal guidelines."  *Rhodes*, 665 N.E.2d at 1272.[7]

Under Illinois law, "every person owes a duty of ordinary care to all others to guard

against injuries which naturally flow as a reasonably probable and foreseeable consequence of an

act."  *Simpkins*, 965 N.E.2d at 1097.  "Even when one has not created the risk of harm, a duty to

take affirmative action to aid another may arise where a legally recognized 'special relationship'

exists between the parties."  *Id.*  In certain circumstances, the employer-employee relationship

can impose upon an employer the duty to control the individual who is the source of the harm.

*Id.* at 1098.  To establish this duty to control, a plaintiff must establish that Pilot knew or had

reason to know of the need to control Cieplevicz, that it knew or had reason to know that it had

the ability to control her, and that it negligently failed to act on that information.  *Hills v.*

*Bridgeview Little League Ass'n*, 745 N.E.2d 1166, 1180 (Ill. 2000).  Plaintiff has failed to carry

that burden.  Nothing in Plaintiff's complaint or brief suggests that Pilot had any reason to

believe that its decision to retain Cieplevicz would result in Cieplevicz defaming Plaintiff with

---

[7] As a general rule, the Court may not at the motion to dismiss stage consider extraneous materials
submitted by a defendant without converting the motion to one for summary judgment.  See Fed. R. Civ.
P. 12(d).  However, "documents attached to a motion to dismiss are considered part of the pleadings if
they are referred to in the plaintiff's complaint and are central to his claim." *Wright v. Assoc. Ins. Cos.,*
*Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994).  To the extent that the "Personnel Manual" that Defendants have
submitted [15-2] is the "employee handbook" to which Plaintiff alludes, which appears to be the case, it fits
these criteria, at least in the context of the instant claim.  Additionally, Plaintiff does not object to the
submission or the Court's consideration of it.  Nonetheless, because the internal policies contained in the
handbook cannot create a duty for purposes of Plaintiff's negligence claim, the Court has not considered
the copy of the handbook that Defendants provided in connection with this claim or any others.

false allegations of sexual harassment. Plaintiff expressed concern that Cieplevicz would engage in violence, not defamation. *Cf. Van Horne v. Muller*, 705 N.E.2d 898, 906 (Ill. 1998). Plaintiff's allegations that Pilot was aware of a "consensual relationship" between Plaintiff and Cieplevicz, see [24] at 6, do not change the outcome; "consensual relationships" neither preclude nor predict incidents of sexual harassment or employee reports thereof. Defendants' motion to dismiss Count VI is granted.

### G.     Negligence—Failure to Ensure a Safe Workplace (Count VII)

In the final count of his complaint, Plaintiff alleges that by failing to immediately terminate Cieplevicz in the wake of Plaintiff's communication to Branov that he was uncomfortable working with Cieplevicz due to her alleged violent tendencies, "Pilot breached its obligation to [him] to ensure his personal safety within his workplace and showed a reckless disregard for his right to a safe and productive work environment." [1] ¶ 96.

Despite Defendants' suggestion to the contrary, see [15] at 25-26, "Illinois law recognizes a cause of action against an employer for negligently hiring, or retaining in its employment, an employee it knew, or should have known, was unfit for the job so as to create a danger of harm to third persons." *Van Horne v. Muller*, 705 N.E.2d 898, 904 (Ill. 1998). "An action for negligent hiring or retention of an employee requires the plaintiff to plead and prove (1) that the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the employee's hiring or retention; and (3) that this particular unfitness proximately caused the plaintiff's injury." *Id.* Because "liability arises in this context when a *particular* unfitness of an employee gives rise to a particular danger of harm to third parties," *id.* at 905, a plaintiff must establish "a sufficient nexus between the

particular alleged unfitness of [the employee] and the injury suffered by plaintiff." *Id.* "The particular unfitness of the employee must have rendered the plaintiff's injury foreseeable to a person of ordinary prudence in the employer's position." *Id.* at 906.

Here, Plaintiff alleges that he told Pilot, through Branov, about the off-premises physical altercation Cieplevicz had with his girlfriend. Plaintiff also alerted Pilot to his concerns that Cieplevicz's assaultive conduct was "not an isolated incident," that Cieplevicz "was capable of repeating such behavior," and that he was uncomfortable with the prospect of "a continued working relationship with Kathy Cieplevicz." [1] ¶ 94. Plaintiff further alleges that, true to his warnings to Pilot, he suffered discomfort and emotional harm because he had to continue to work with Cieplevicz. See *id.* ¶ 97.

But Plaintiff has not alleged that Cieplevicz acted on her alleged violent tendencies, inside the workplace or elsewhere, after Plaintiff brought his concerns to Pilot's attention. Nor has he pointed to any case law that suggests that an employer has a duty to immediately terminate an employee when another employee expresses his "discomfort with a continued working relationship" with that person due to events that transpired outside the office. Plaintiff may have been uncomfortable at work, but he has not alleged that Cieplevicz's mere presence rendered the workplace objectively unsafe. Because Plaintiff has failed to demonstrate a nexus between the alleged unfitness – Cieplevicz's demonstrated willingness to engage in violent conduct – and the injury he suffered – discomfort due to her presence – the Court grants Defendants' motion to dismiss Count VI.

## IV.    Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss [14]. The Court gives Plaintiff 28 days from the date of this order to replead the

counts that the Court has dismissed and otherwise supplement the allegations of his complaint if

he believes that he can do so within the requirements of Federal Rule of Civil Procedure 11.


Dated: September 25, 2013

_____
Robert M. Dow, Jr.
United States District Judge